**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FLUKE CORPORATION,<br>6920 Seaway Blvd.<br>Everett, WA 98203<br><br>and<br><br>EKATERINA KATASHINSKAIA,<br>1600 2nd Avenue, Apt. 402<br>Seattle, WA  98101<br>             Plaintiffs,<br><br>      v.<br><br>UNITED STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES,<br>20 Massachusetts Avenue, N.W.<br>Washington, DC 20529,<br><br>and<br><br>LEE FRANCIS CISSNA, DIRECTOR,<br>UNITED STATES CITIZENSHIP AND<br>IMMIGRATIONS SERVICES, IN HIS<br>OFFICIAL CAPACITY,<br>20 Massachusetts Avenue, N.W.<br>Washington, DC 20529,<br><br><br>             Defendants. | CIVIL ACTION NO.: |

**COMPLAINT FOR REVIEW OF AGENCY ACTION**
**UNDER THE ADMINISTRATIVE PROCEDURE ACT**

## I.      NATURE OF THE ACTION

This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et*

*seq.*, and seeks this Court's review of agency action under the Administrative Procedure Act, 5

U.S.C. § 701 *et seq.* Plaintiffs, Fluke Corporation ("Fluke"), and their former employee, Ekaterina

Katashinskaia ("EK"), a citizen of Russia, seek judicial review of final agency action, taken on

January 2, 2019, of Defendants, U.S. Citizenship and Immigration Services ("Defendant" or "USCIS"), and its Director, Lee Francis Cissna, denying a work-visa petition submitted on EK's behalf by Fluke, requesting that EK be accorded H-1B visa classification and granted a change of her nonimmigrant visa status from F-1 academic student to H-1B specialty occupation worker.

## II.   PARTIES

1.      Plaintiff, Fluke Corporation, is multi-national manufacturer, distributor and global leader of industrial test, measurement and diagnostic equipment and software. It maintains manufacturing centers in the United States, the United Kingdom, Asia, and the Netherlands, as well as sales and service subsidiaries in Europe, North America, South America, Asia, and Australia.

2.      Plaintiff, Ekaterina Katashinskaia ("EK"), is a resident of Seattle, Washington, who last entered the United States in lawful nonimmigrant F-1 academic-student visa status on February 25, 2018.  She holds a Master of Business Administration degree from the University of Virginia, conferred on May 21, 2017, and a Diploma conferred on June 27, 2008 by Ivanovo State University (Russia) conferring upon her the qualification, "Economist," with specialization in "Accounting, Analysis and Audit."  Fluke employed EK in the position of Global Vertical Marketing Manager from August 21, 2017 to September 30, 2018 at the annual salary of $123,000 while holding F-1 OPT (optional practical training).

3.      Defendant USCIS is a subordinate component of DHS, and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1).  DHS assumed responsibility from the former Immigration and Naturalization Service ("INS") on March 1, 2003, to administer responsibilities under the INA, and in particular to fulfill its limited duties under 8 U.S.C. § 1101(a)(15)(h)(i)(b)

("H-1B visas"). The Secretary of DHS has delegated this authority to DHS's subordinate agency, USCIS. See DHS Delegation Number 0150.1, II. H (June 5, 2003).

4.      Defendant Lee Francis Cissna is sued in his official capacity as Director of U.S. Citizenship and Immigration Services.

## II.      **JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY**

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States. This Court has jurisdiction to enter declaratory judgments under 28 U.S.C. § 1361 and invalidate unlawful agency actions under 5 U.S.C. § 706, and to review agency action arising under the Immigration and Nationality Act, 8 U.S.C. § 1101 et. seq.,

5.      The United States has waived sovereign immunity under 5 U.S.C. § 702.

## III.      **STANDING**

6.      Plaintiffs have a legally protected interest in receiving a lawful decision from Defendants on Fluke's H-1B petition and request for change of nonimmigrant status on EK's behalf, *i.e.*, a decision which is neither arbitrary nor capricious, nor an abuse of discretion, and which is in accordance with law, as provided in 5 U.S.C. § 706(2). This right has been infringed inasmuch as the unlawful denial of this petition has caused Fluke's request for change of EK's nonimmigrant visa status from F-1 to H-1B status to likewise have been denied. Defendants' denial also resulted in termination of EK's employment with Fluke under F-1 OPT (optional practical training) employment authorization in the position of Global Vertical Marketing Manager, and the resulting loss of EK's annual salary of $123,000.

7.      Defendants' infringement of EK's right to continued employment has caused EK concrete and particularized injury in that as a result of this invasion: (A) she can no longer be employed by Fluke and so cannot derive the compensation she previously received from her employment; and (B) her presence in the United States has been rendered unlawful.

8.    Defendants' infringement of this right caused Fluke to lose the anticipated benefit of Plaintiff EK's services, and the revenue to be derived as a result of those services

9.    There is a causal connection between the injury-in-fact and the Defendants' challenged behavior in that it is precisely the Defendants' denial of Fluke's petition and its request on EK's behalf for change of status from F-1 to H-1B visa status which prevents EK from working for Fluke.   Furthermore, the injury-in-fact could well be redressed by a favorable ruling in that such a ruling will enable Fluke to employ EK again and so enable her to support herself and, on a *nunc pro tunc* basis, lawfully remain in the United States, and enable Fluke once again to derive the economic benefits of her services as an employee.

## IV.    **VENUE**

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendants are located in the District of Columbia.

## V.    **LEGAL BACKGROUND**

11.    The Immigration and Nationality Act ( "INA"), first enacted in 1965, as amended in 1990, established a quota-based nonimmigrant work visa program, known as the H-1B program, with jurisdiction currently and in recent years divided among three federal departments, the U.S. Department of Labor ("DOL" or "Labor Department"), U.S. Department of Homeland Security ("DHS"), and U.S. Department of State ("DOS" or "State").   The H-1B program allows employers to sponsor and hire nonimmigrant foreign workers to work for prescribed periods of time in "specialty occupations" that require specific knowledge and a relevant degree.   8 U.S.C. § 1101(a)(15)(H)(i)(b); 20 C.F.R. § 655.700.   "Specialty occupations" are occupations that require "theoretical and practical application of a body of highly specialized knowledge," and "a bachelor's or higher degree in the specific specialty (or its equivalent)" as a minimum for entry

into the occupation in the United States.  8 U.S.C. § 1184(i)(1); 8 C.F.R. § 214.2(h)(4)(ii); 20

C.F.R. § 655.715.

12.     The INA -- with exceptions not here relevant – limits by annual fiscal-year quota

the number of H-1B visas that can be issued (with each fiscal year spanning the period from

October 1 to September 30).  It provides that not more than 65,000 foreign citizens per fiscal

year may receive an H-1B visa or status, with an additional 20,000 yearly allotment available to

graduates of certain U.S. nonprofit Master's and Ph.D. degree programs, for a total of 85,000 per

year.  *See* 8 U. S. C.  §§ 1184(g)(1)(A)(vii) and 1184(g)(5)(C).

13.     An employer seeking to hire a nonimmigrant in an H-1B specialty occupation

must first complete a Labor Condition Application ("LCA") and file it with the DOL. 20 C.F.R.

§ 655.700 *et seq.* The LCA requires an employer to attest compliance with certain labor

protections.  Attestations include the employer's commitment to:

A.     Pay the H-1B worker the "required wage" (20 C.F.R. § 655.731);

B.     Provide the H-1B worker with working conditions, including employee benefits,

which will not adversely affect the working conditions of similarly employed

workers (20 C.F.R. § 655.732);

C.     Confirm that there is no strike, lockout, or work stoppage at the job site in the

same job as that which H-1B worker will perform (20 C.F.R. § 655.733); and

D.     Comply with certain notice requirements concerning the introduction of an H-1B

worker to the job site and an opportunity for any interested party to complain to

DOL about perceived LCA violations (20 C.F.R. § 655.734).

14.     The Secretary of DOL is charged with approving an LCA submitted by an

employer if it is complete and facially accurate ("not obviously inaccurate") within seven

55253031v.3

working days of its submission. *See* 20 C.F.R. § 655.740(a)(1). The DOL Secretary is also empowered to investigate complaints of aggrieved parties, enforce H-1B LCA violations, impose civil money penalties, award back wages, and grant other forms of "make-whole" relief. *See* 20 C.F.R. § 655. 800 *et seq.*

15.    A U.S. employer seeking to hire or continue to employ an H-1B worker in the U.S. must submit a DOL-certified original LCA and a petition to Defendant USCIS for the latter's determination of whether – based on consideration of the evidence submitted by the employer or requested by USCIS – the proffered job and proposed H-1B worker each qualify under the legal standard for a "specialty occupation." 8 C.F.R. § 214.2(h)(4)(ii) (definition of "specialty occupation") and § 214.2(h)(9)(i) (Defendants' duty to consider the evidence).

16.    In the case of an approval of an H-1B visa petition, Defendant USCIS provides notice of its decision to the DOS consular post designated in the petition so that the nonimmigrant beneficiary may apply for an H-1B visa with which to request admission to the United States in H-1B status following travel abroad.

17.    As described below, the H-1B legal scheme has undergone statutory and regulatory modifications over the years which inform the meaning of the term "specialty occupation."

18.    With the enactment of the Homeland Security Act of 2002 ("HSA") Pub. L. 107-296, 116 STAT. 2135 (Nov. 25, 2002), codified at 6 U.S.C. § 101 *et seq.*, Executive Branch responsibilities for the adjudication of immigration petitions changed dramatically. HSA § 471 resulted in the abolishment of the former Executive Branch agency, the INS – an agency previously within the U.S. Department of Justice ("DOJ"). *See* 6 U.S.C. §291. Moreover, HSA § 451 (a) and (b) created the Bureau of Citizenship and Immigration Services (now known as

U.S. Citizenship and Immigration Services) and transferred to it adjudicative authority and responsibility for adjudications conducted at Service Centers. *See* 6 U.S.C. §271(a) and (b). Thus, on and after March 1, 2003, USCIS has exercised its adjudicative responsibilities under the INA, and in particular, discharged the former INS's prescribed adjudicative duties under 8 U.S.C. § 1101(a)(15)(h)(i)(b) (the "H-1B" visas category).

19.    Since at least the 1960s and continuing until the enactment of the Immigration Act of 1990, Pub. L. 101-649, 104 STAT. 4978 (Nov. 29, 1990) ("IMMACT"), legacy INS had consistently decided in its precedent administrative decisions and its regulations to accord nonimmigrant work visa status and employment authorization to temporary workers under what was then designated as the "H-1" visa category for aliens who the agency adjudicated to be persons of "distinguished merit and ability" – a phrase in the INA describing the H-1 visa classification.

20.    For decades, through precedent decisions and regulations, INS consistently determined that aliens of "distinguished merit and ability" were eligible for H-1 visas if they were classifiable as members of a particular "profession," under the definition of that term in INA § 101(a)(32), codified at 8 U.S.C. § 1101(a)(32). This section has long provided, and still states:

> The term "profession" **shall include but not be limited to** architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries. *Id.* (emphasis added.)

21.    For decades preceding passage of IMMACT, binding INS administrative case law and formal rulemaking addressed the need to respond to developments in U.S. business in the U.S. economy that have created a number of new professional occupational classifications. *See* 55 Fed. Reg. 2606, 2608-2610 (Jan. 26, 1990) ("Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act") (Supplementary Information).

-7-

22.     INS responded to these developments by defining and expanding the non-exclusive list of "profession[s]." An often-cited INS precedent decision thus became the first to supplement the definition of "profession" in order to determine whether occupations not listed in INA § 101(a)(32) [8 U.S.C. § 1101(a)(32)] nonetheless could be classified as qualifying professions. *See Matter of Shin*, 11 I&N Decisions 686, 687 (D. Dir., 1966),[1] which stated:

> As the foregoing  [list INA § 101(a)(32)]  is not all-inclusive and is illustrative rather than descriptive, it is necessary to evaluate the term "profession" in a definitive sense based on the general character of the professions specifically recognized to ascertain whether a given activity not named therein may be included, within the intendment of the [INA]").

23.     In *Shin*, the INS ultimately ruled:

> The "common denominator is the fact that all [professions] require specialized training that is normally attained through high education of a type for which at least a bachelor's degree can be obtained, or through equivalent specialized instruction [or equivalent experience].  *Id.*

24.     The INS in *Shin* observed that "the vocations included in the term 'profession' in our modern highly industrialized society are constantly expanding, consistent with the greater knowledge and specialized training that such a society demands. *Shin* required, however, that "the mere acquisition of a degree or equivalent experience does not, of itself, qualify a person as a member of a profession.  Rather, the "knowledge acquired must also be of nature that is a realistic prerequisite to entry into the particular field of endeavor." 11 *I&N Decisions* at 688.

---

[1] *Matter of Shin*, *supra*, involved interpretation of the word, "profession," in INA § 101(a)(32) [8 U.S.C. § 1101(a)(32)] for purposes of a then-extant employment-based immigrant visa category – INA § 203(a)(3) [8 U.S.C. § 1151(a)(3)] – available to so-called Third Preference aliens who are "members of a profession." In *Matter of Essex Cryogenics Industries, Inc.*, 14 *I&N Dec.* 196 (D.A.C. 1972), however, INS ruled that a noncitizen mechanical engineer who is classifiable as a member of the profession of engineering under INA § 101(a)(32) [8 U.S.C. § 1101(a)(32)] is eligible for classification as a nonimmigrant H-1 alien of distinguished merit and ability under former INA § 101(a)(15)(H)(i) [former 8 U.S.C. § 1101(a)(15)(i)].

25.     In an effort to codify its precedent decisions, INS issued a final H-1 regulation on

January 26, 1990. *See* 55 Fed. Reg. 2606 (Jan. 26, 1990) ("Temporary Alien Workers Seeking

Classification Under the Immigration and Nationality Act").

26.     The Supplementary Information to this final rule made clear that INS had long

treated the H-1 "distinguished merit and ability" standard and the membership in a "profession"

definition as equivalent. *See* 55 Fed. Reg. at 2608-2609. In doing so, INS parroted the *Shin*

"common denominator" analysis in the preface to the January 26, 1990 final rule:

> [The] common denominator for determining that an occupation is a profession is
> the requirement of at least a baccalaureate degree awarded for academic study in a
> specific discipline or narrow range of disciplines for entry into the occupation.

27.     The January 26, 1990 final rule also included a definition of "Profession":

> "Profession" means an occupation which requires theoretical and practical
> application of a body of highly specialized knowledge to fully perform the
> occupation in such fields of human endeavor as: Architecture, engineering,
> mathematics, physical sciences, social sciences, medicine and health, education,
> **business specialties**, accounting, law, theology, and the arts. 55 Fed. Reg. at 2623
> (emphasis added).

28.     With the passage of IMMACT, Congress eliminated the H-1 standard of

"distinguished merit and ability," and replaced it with the new H-1B visa category for aliens in a

particular "specialty occupation."

29.     In interpreting the new H-1B specialty-occupation phrasing, INS determined,

however, that despite the change in terminology, namely, the replacement of the H-1

"distinguished merit and ability" requirement, and the equivalent concept of membership in a

"profession," with the new H-1B formulation, "specialty occupation," Congress intended no

substantive change.

30.     INS reached this conclusion by interpreting IMMACT's legislative history. *See*

House Report 101-723(1) 1990 U.S.C.C.A.N. 6710, 6747, 1990 WL 200418, which made clear

that the specialty-occupation requirement can be satisfied by attaining the theoretical and

practical application of a body of highly specialized knowledge through at least a bachelor's

degree in a specific specialty:

> A specialty occupation is defined as one that requires theoretical and practical application of a body of highly specialized knowledge and attainment of a bachelor's (or higher) degree in the specific specialty to meet the minimum requirement for a person entering that occupation. Thus, a baccalaureate degree alone would not suffice in the case of an occupation which normally requires a higher entry level education.

31.     In short, as INS would ultimately confirm, despite IMMACT's replacement of the

H-1 visa with the new H-1B visa, the same eligibility criteria for an H-1 visa would still apply to

the new H-1B visa. *See* 56 Fed. Reg. 61111, 61112 (Dec. 2, 1991) ("Temporary Alien Workers

Seeking Classification Under the Immigration and Nationality Act").

32.     The current regulatory definition of "specialty occupation" is found at 8 CFR §

214.2(h)(4)(ii).  It provides:

> Specialty occupation means an occupation which requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor including, but not limited to, architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, **business specialties**, accounting, law, theology, and the arts, and which requires the attainment of a bachelor's degree or higher in a specific specialty, or its equivalent, as a minimum for entry into the occupation in the United States. *Id.* (emphasis added).

33.     Defendants' current regulation, 8 CFR § 214.2(h)(4)(iii)(A), provides four

alternative ways to establish the specialty-occupation requirement:

A.      A baccalaureate or higher degree or its equivalent is normally the minimum

requirement for entry into the particular position;

B.      The degree requirement is common to the industry in parallel positions among

similar organizations or, in the alternative, an employer may show that its

particular position is so complex or unique that it can be performed only by an

individual with a degree;

C.    The employer normally requires a degree or its equivalent for the position; or

D.    The nature of the specific duties are so specialized and complex that knowledge

required to perform the duties is usually associated with the attainment of a

baccalaureate or higher degree.

## VI.    **FACTUAL ALLEGATIONS**

34.    On or about April 3, 2018, Fluke filed its petition with Defendants requesting H-1B visa classification and a change of nonimmigrant status from F-1 academic student to H-1B specialty occupation worker on behalf of Plaintiff EK in order to have the petition accepted in the 2019 Fiscal Year annual H-1B lottery and to have allowed her to serve in the position of Global Vertical Marketing Manager for an annual salary of $123,000.

35.    On April 23, 2018, Defendants accepted the petition and issued a receipt notice, assigned No. WAC1814954243, thereby confirming that the petition had been accepted for adjudication in the 2019 Fiscal Year annual H-1B lottery.

36.    Fluke's petition filed with Defendants contained substantial, probative and relevant evidence, including:

A.    Evidence that Defendants had previously issued her USCIS Form I-766

(Employment Authorization Card) bearing the notation, "Student Post-

Completion OPT," U.S. Immigration and Customs Enforcement Form I-20

(Certificate of Eligibility for Nonimmigrant Student Status), bearing SEVIS-ID:

N0013744169 (F-1) and the endorsement of the University of Virginia Designated

School Official that she had been approved for Post-Completion OPT on a full-

time basis. (According to Defendants' regulations, an F-1 student may apply to

USCIS for authorization for temporary employment for optional practical training only if it is "directly related to the student's major area of study." *See* 8 CFR § 214.2(f)(10)(ii)(A). Defendants' regulations also provide that "[a] student must have a recommendation from his or her DSO in order to apply for OPT," thereby confirming the DSO's assessment that the proposed optional practical training is directly related to the student's major area of study. *See* 8 CFR § 214.2(f)(12)(i).);

B.   Plaintiff's University of Virginia Master of Business Administration degree certificate, conferred May 21, 2017; and

C.   Plaintiff's academic transcript issued by the University of Virginia, Office of the Registrar, which listed her recorded credits in, and successful completion of, numerous graduate business courses directly relevant to the H-1B specialty occupation of Global Vertical Marketing Manager, including but not limited to "Management Communication," Marketing," "Decision Analysis," Global Economies and Markets," "Marketing Part II," "Global Economies & Markets Pt. II," "Integrated Marketing Communication," "Digital Marketing," "Marketing Analytics," "Deviant Marketing," "Hot Topics in Marketing," and "Managing Consumer Brands."

37.   On September 13, 2018, Defendants issued a Request for Evidence and required Fluke to respond to the request by December 9, 2018.

38.   On or about December 4, 2018, Fluke submitted to Defendants its response to the Request for Evidence. Fluke's response included, inter alia, its own 10-page letter elaborating upon the prospective duties of Plaintiff as Global Vertical Marketing Manager; a November 19, 2018 "Expert Opinion Evaluation," by Professor Bala K. R. Balachandran, Professor Emeritus of

-12-

Accounting and Operations Management in the New York University Stern School of Business (offering the opinion with accompanying explanation to confirm, that "the position of Global Vertical Marketing Manager is clearly a specialty position, and requires the services of someone with advanced training through a Bachelor's program in Marketing or a related field"); an excerpt from the U.S. Department of Labor's Occupational Outlook Handbook ("OOH") and its description of Marketing Managers; postings from other employers offering parallel positions comparable to that offered Plaintiff to show that at least a bachelor's degree or its equivalent in marketing or a related field of study is required; resumes and internal hiring forms for other Global Vertical Marketing Managers employed by Fluke to show that each possesses a bachelor's degree or its equivalent in marketing or related field; and work product prepared by Plaintiff to establish her highly complex understanding and marketing approaches she has employed in this position.

39.     In particular, Fluke's letter responding to the Request for Evidence offered a detailed description of the duties to be performed by the Plaintiff in the role of Global Vertical Marketing Manager.  The letter stated:

Ms. Katashinskaia will also perform the following:

A.     Design the global product and marketing strategy and quantify customer benefits based on product offerings; and define the customer value proposition (a business or marketing statement that describes why a customer should buy a product or use a service) with new software specifications and designs;

B.     Gather technical requirements from regional business units and translate into a common set of portfolio and marketing non-functional requirements;

C.  Run vendor selection through Fluke's Request For Proposals/Quotations (RFP/RFQ) process;

D.  Justify portfolio and marketing change decisions on existing portfolio with detailed financial analysis (3-year forecast) for C-level executive communication;

E.  Maintain close interaction with Development Leads, Product Architects, and key customers to communicate and enforce marketing strategy;

F.  Set quality goals and tracking metrics in managing customer satisfaction and attrition;

G.  Define and deploy Service Level Agreement terms between regional and core teams; and set requirements to support and track implementation;

H.  Determine User Interface/User Experience (UI/UX) gaps and plan, including conducting  competitive analysis with best-in-class UX, generating test plan/cases, and soliciting cross-team input;

I.  Maintain product portfolio roadmap, ensuring conformance to Fluke stage gate product release management process;

J.  Monitor and incorporate industry and market intelligence and innovations, sharing findings with the product team via monthly presentations;

K.  Define user personas for individual products, gathering requirements from existing and potential customers (Agile product backlog);

L.  Write product requirements and use case scenarios, defining market requirements and packaging features into product releases while ensuring regulatory compliance;

M.  Maintain status dashboard for all portfolio products a project management tool;

N.   Develop and implement the strategic plan for Fluke's software products by defining and sizing market segments to discover and validate market problems (both existing and future customers);

O.   Seek new market opportunities by leveraging Fluke's distinctive competitiveness and product superiority in convenience retail; conduct win/loss analyses past sales deals; and identify and detect product problems, staying close to the competition while analyzing client needs;

P.   Analyze product profitability and sales success to understand the key marketing analytics of the products;

Q.   Create and maintain the financials (business plan), including product pricing; liaise with global finance controller for C-level executive reporting;

R.   Create product positioning for all markets and all buyer personas;

S.   Develop market messaging and go-to-market (GTM) plans and perform competitor profiling by gathering and processing business intelligence data on competing solution providers in target markets with the goal of generating key information about them and identifying key competitive differences; summarize information for each region to identify sales by competitor by customer segment;

T.   Conduct competitive market analysis for each solution category (analytics, loyalty and ERP); identify and validate target industry segments, built use cases and complete financial analysis;

U.   Continuously develop internal subject matter expertise on key marketing topics, including  analytics, loyalty programs, and ERP, maintaining a close pulse on the retail industry to identify emerging themes;

V.  Attend industry events by representing Fluke to monitor industry innovations and cultivate relationships with potential partners.

40.  Fluke's responsive letter to the Defendants' Request for Evidence also contained a detailed chart which cross-referenced each subsidiary job duty with the specific postsecondary academic courses Plaintiff completed to show how she obtained the requisite theoretical and practical application of a body of highly specialized knowledge of Marketing and related business specialties.

41.  On January 2, 2019, Defendants issued their decision and denied Fluke's H-1B petition.  On the same day Defendants issued a separate decision and denied Fluke's request that Plaintiff's status be changed from F-1 academic student to H-1B specialty occupation worker. Defendants premised their decision to deny the change of status request on the basis that they had already denied the H-1B petition.

42.  Defendants' decision denying Fluke's H-1B petition does not address its own regulatory definition of specialty occupation as including "business specialties," and thus does not disclose whether they consider the proffered H-1B position involving marketing responsibilities to be a business specialty, although Plaintiff maintains that marketing is a business specialty within the meaning of the H-1B specialty occupation definition.

43.  Moreover, Defendants' decision denying Fluke's H-1B petition asserts that the extensive listing of discrete responsibilities contained in the initial petition provides "insufficient detail" to establish that a bachelor's or higher degree or its equivalent is normally the minimum requirement for entry into the particular position.

44.     Defendants' decision simply does not address the far more elaborate description of responsibilities and discrete tasks associated with the proffered job contained in Fluke's response to the Request for Evidence.

45.     Furthermore, Defendants' decision denying Fluke's H-1B petition: (A) summarily rejected without analysis the expert opinion of Professor Balachandran holding that the duties of the position satisfy the specialty-occupation criteria; (B) made no mention of the OOH and its description of the customary requirements and duties of Marketing Managers; (C) asserted without specific analysis that the comparable requirements of other employers offering parallel position are "dissimilar to your organization;" and (D) disregarded the evidence showing that Fluke normally required at least a bachelor's or higher degree in Marketing or a related field of other individuals whom it employed as Global Vertical Marketing Managers.

46.     The Defendants' decision denying Fluke's H-1B petition thus disregarded relevant and probative evidence and unlawfully and arbitrarily interpreted each and all of the four regulatory alternatives to establish an H-1B specialty occupation set forth at 8 C.F.R. § 214.2 (h)(4)(iii)(A).

47.     Upon information and belief, Defendants' denial of Fluke's H-1B petition and change of status request submitted on behalf of Plaintiff was influenced by the Defendants' unlawful bias against U.S. employers seeking to employ foreign nationals in the nonimmigrant "H-1B" visa category.

48.     On April 18, 2017, for example, President Donald Trump signed an executive order entitled "Presidential Executive Order on Buy American and Hire American." Exec. Order No. 13,788, 82 Fed. Reg. 18837 (Apr. 18, 2017). The executive order established, by Presidential proclamation, that "it shall be the policy of the executive branch [including the Defendants] to …

hire American." Id. § 2. The "Hire American" provisions of the executive order directed the

Defendants to "rigorously enforce and administer the laws governing entry into the United States

of workers from abroad" and required that DHS suggest reforms to help ensure that H-1B visas

are awarded to the most-skilled or highest-paid petition beneficiaries. *Id.* §§ 2, 5.

49.     Defendants' response to the executive order has been swift and comprehensive.

Between January 1, 2017 and August 31, 2017, for instance, Reuters reported a forty-five percent

(45%) increase in the number of RFEs issued to U.S. employers who filed H-1B petitions

compared with the same period in the previous year. *See* Yeganeh Torbati, "Trump

administration red tape tangles up H-1B visa for skilled foreigners, data shows," Reuters (Sept.

20, 2017).   According to the National Foundation for American Policy, those RFEs led to

increased H-1B petition denials, rising forty-one percent (41%) between the third and fourth

quarters of fiscal year 2017. *See* National Foundation for American Policy, H-1B Denials and

Requests for Evidence Increase Under Trump Administration 1, 4-5 (Jul. 2018).

50.     The Defendants' intent to curtail the legal right of U.S. employers to sponsor

foreign nationals for nonimmigrant "H-1B" status is plain. In DHS's 2018 regulatory agenda, for

instance, DHS has previewed its intent to "revise the definition of specialty occupation" through

its 2018 regulatory agenda. *See* Office of Management and Budget, "Strengthening the H-1B

Nonimmigrant Visa Classification Program" (Fall 2018).

51.     The practical effect of the Executive Order has been the unstated imposition of a

higher burden of proof, such as "clear or convincing" or "beyond a reasonable doubt," on U.S.

employers seeking to sponsor foreign nationals in nonimmigrant "H-1B" status. This clear

contravention of established precedent, *see Matter of Chawathe*, 25 I&N Dec. 369, 375-376

(2010), absent required rulemaking, is a clear legal error which has prejudiced Plaintiff and led

to Defendants' decisions to deny Fluke's H-1B petition and change of status request on her

behalf.

52.     Recent data published by USCIS starkly illustrates the consequences of such

invisible policy changes.  USCIS' data on H-1B adjudications reveals a steady decline in

approval rates for H-1B petitions in the last two years.  For example, approval rates in October

2017 were 86.1% and had declined to 76.8% by October 2018.

53.     The courts have determined that the approach pursued by Defendants in this case

impermissibly narrows the plain language of the INA and that Defendants' regulations do not

restrict qualifying occupations to those for which there exists a single, precisely tailored and

denominated degree program.  *See Residential Finance Corp. v. USCIS*, 839 F. Supp. 2d 985

(S.D. Ohio 2012) (Market research analyst found to be an H-1B specialty occupation); *Raj and*

*Company v. USCIS*, Case No. C14-123RSM, 2015 WL 13648578 (W.D. Wash. Apr. 10, 2015)

(Marketing Analyst & Specialist position held an H-1B specialty occupation).[2]

---

[2] *See also*, 2015 Annual Report of the Citizenship and Immigration Services Ombudsman, pp. 42-43, citing frequent stakeholder criticism of prevalent H-1B specialty-occupation adjudications by Defendant (accessible at: https://www.dhs.gov/sites/default/files/publications/2015%20CISOMB%20Annual%20Report_5 08_0.pdf [last visited: Mar. 8, 2019]); April 16, 2015 Questions and Answers from USCIS Meeting with the American Immigration Lawyers Association ("AILA"), Topic 13.a., pp. 9-10, in which Defendant challenged the statement of representatives of the nation's largest immigration bar association that the agency's H-1B specialty-occupation requirement of a degree in a single academic specialty – found unlawful by the federal courts cited in the body of the text above – is a widespread practice (accessible at: https://competeamerica.org/2018/11/02/letter-on-legal-issues-regarding-uscis-h-1b-adjudications/ [last visited: Mar. 8, 2019]). In its Answer to Topic 13.a., Defendant USCIS stated, "USCIS disagrees that the averred practice is common. Petitioners may challenge any such decisions through available administrative motion and appeal processes. It should also be noted that the referenced district court cases involved field decisions that were not first appealed to the AAO [Administrative Appeals Office].

## COUNT ONE
## Violation of the Administrative Procedure Act
## 5 U.S.C. § 701, *et seq.*

54.     Plaintiff re-alleges and incorporates herein by reference, as if fully set forth herein, the allegations in paragraphs 1-53 above.

55.     Plaintiff is entitled to review by this Court pursuant to 5 U.S.C. §§ 701-706.

56.     A reviewing court shall "hold unlawful and set aside agency action . . . found to be -- arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

57.     Defendants denied Fluke's H-1B petition and request for change of status to H-1B status solely on the ground that the evidence in the record was insufficient to establish that the Global Vertical Marketing Manager position is in a specialty occupation.

58.     Fluke, on behalf of Plaintiff EK, submitted evidence demonstrating that the proffered position satisfied each and all of the four alternative regulatory criteria for demonstrating a "specialty occupation." 8 C.F.R. § 214.2(h)(4)(iii)(A)(1) - (4).

59.     Defendants failed to properly consider all record evidence; reached factual conclusions unsupported by any evidence in the record; disregarded the OOH; misconstrued the governing regulations; applied a heightened burden of proof; and erroneously concluded that Fluke, on behalf of Plaintiff EK, had not demonstrated that the Global Vertical Marketing Manager position fell within the regulatory definition of a "specialty occupation."

60.     Defendants' decision to deny Fluke's H-1B petition filed for the benefit of Plaintiff constitutes agency action which is arbitrary, capricious and otherwise not in accordance the law in violation of the APA. 5 U.S.C. § 706(2)(A).

61.     As the Defendants applied the incorrect burden of proof in its adjudication of Fluke's H-1B petition on behalf of Plaintiff – constituting an error of law – the Court should review this appeal *de novo*. *See* 5 U.S.C. § 706(2)(F).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.     Declare that Defendants' determination that Fluke's Global Vertical Marketing Manager position does not meet the definition of a specialty occupation was arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); and

B.     Vacate the Defendants' denial of Fluke's H-1B petition and change of status request on behalf of Plaintiff and remand this matter to Defendants with instructions to approve the Form I-129, Petition for Nonimmigrant Worker, filed by Fluke within ten days of the date of the Court's Order, and, on a *nunc pro tunc* basis, reinstate Plaintiff EK's lawful nonimmigrant visa status, and approve Fluke's request contained in Form I-129 that she be granted a change of status to H-1B visa status; and

C.     Grant such other relief as the Court deems just, equitable and proper.

DATED: March 13, 2019                    Respectfully submitted,

                                         SEYFARTH SHAW LLP


                                         By:/s/ Samantha L. Brooks
                                             Samantha L. Brooks (DC Bar No. 1033641)
                                             Angelo A. Paparelli (to be admitted *pro hac vice*)
                                             SEYFARTH SHAW LLP
                                             975 F St. NW
                                             Washington, DC 20004
                                             Telephone: (202) 828-3560
                                             Facsimile:  (202) 641-9209
                                             sbrooks@seyfarth.com apaparelli@seyfarth.com

                                             *Attorneys for Plaintiffs*